UNITED STATES v. WORLD'S COLUMBIAN EXPOSITION et al.

(Circuit Court, N. D. Illinois. June 8, 1893.)

1. WORLD'S COLUMBIAN EXPOSITION—CONSTRUCTION OF STATUTE—BY-LAWS.

Act Cong. April 25, 1890, providing for the holding of the World's Columbian Exposition at Chicago, gave the local corporation in charge of the enterprise power to make rules and regulations "governing admission fees, or otherwise affecting the rights and privileges or interests of the exhibitors or the public, subject, however, to such modification, if any, as may be imposed by the majority of" the national commission. The local corporation adopted a rule closing the fair on Sundays, and this rule was ratified by the commission. Afterwards the local corporation attempted to repeal the rule, but such repeal was not ratified by a majority of the commission. *Held*, that the rule was not legally repealed, since, when once the rule had been sanctioned by the commission, it could not be repealed without the same sanction. Grosscup, District Judge, dissenting.

2. SAME—CHARITABLE GIFT—EQUITY JURISDICTION.

Act Cong. August 5, 1892, by which congress donated $2,500,000 to the World's Columbian Exposition upon condition that if the gift were accepted the exposition should be closed Sundays, constituted a charitable gift upon condition, which condition is enforceable in equity.

3. SAME—CONSTITUTIONAL LAW—SUNDAY.

Said act is not unconstitutional as interfering with the free exercise of religion.

4. SAME—EQUITABLE RELIEF—WITHHOLDING PART OF GRANT.

The right of the government to equitable relief against a violation of said act is not impaired by the act of March 3, 1893, which directed the secretary of the treasury to retain part of the appropriation until the local corporation had given the government security for a proposed loan for the payment of awards for foreign exhibitors, or had paid such awards, since such awards constituted a debt for which the local corporation was liable under the act creating the exposition, and which the government was in honor bound to see paid. Grosscup, District Judge, dissenting.

5. SAME—INJUNCTION—RES JUDICATA.

Nor is the right of the government to such relief barred by an injunction issued by a state court, in a suit to which the government was not a party, enjoining the local corporation from closing the exposition on Sundays.

In Equity. On motion for preliminary injunction. Suit by the United States against the World's Columbian Exposition, an Illi-

nois corporation, and others, to restrain the defendants from opening on Sundays the World's Fair held at Jackson Park in the city of Chicago. Before the beginning of this suit a temporary injunction had been granted by the superior court of Cook county forbidding the corporation to close the World's Fair on Sundays. For a full statement of the facts, see the report of this case on appeal. 56 Fed. Rep. 654.

T. E. Milchrist, U. S. Atty., Charles Aldrich, Sol. Gen., Judge Hand, David Fales, and J. L. High, for the United States.

Edwin Walker and Gen. St. Clair, for Exposition Co.

Before WOODS and JENKINS, Circuit Judges, and GROSSCUP, District Judge.

WOODS, Circuit Judge, (orally.) Of the interesting questions involved in the case the first that I shall consider is that of the possession of Jackson Park. It is a question which must be determined by reference to the act of congress of April 25, 1890. There is, in my view of the case, no dispute of fact involved. It is true that the bill alleges and the answer denies that the defendant, the local corporation, delivered possession to the United States, but I do not understand that the denial was intended to put in issue, or does put in issue, any matter of fact touching the possession. It is a matter of legal conclusion, to be deduced from the provisions of the act of congress under which the exposition was inaugurated and is being conducted.

The act referred to was passed April 25, 1890. On August 5, 1890, was passed an act of the legislature of the state of Illinois, and on September 17, 1890, in pursuance of the authority conferred or attempted to be conferred by the act of the legislature, an ordinance was adopted by the commissioners of Jackson Park, permitting the use of the park for the purpose of the World's Fair. Both the act of the legislature and the ordinance refer expressly to the act of congress, showing that the legislature and the park commissioners intended that the park grounds should be used under the provisions of that act. Besides, on July 31, 1890, the general assembly of Illinois proposed a constitutional amendment authorizing the city of Chicago to incur a bonded indebtedness to the amount of $5,000,000 in aid of this project. The people voted on that amendment November 4, 1890, and the adoption of it was proclaimed by the governor November 29, 1890. So that, in addition to the direct act of the legislature of the state and the ordinance of the park commissioners, the consent of the people of Illinois was given by a constitutional amendment, adopted after the park had been designated as the site. There is therefore no room for reasonable question that the park has been lawfully made the site of the exposition.

Now, what relations were established in respect to the possession of the park by the act of April 25, 1890? By the preamble it appears that a national and international scheme was designed which

should be conducted under the sanction of congress. In the body of the act it is first provided that the exposition shall be inaugurated in Chicago. Sections 3 and 4 provide for the appointment by the president of the United States and for the organization of a commission, which by section 5 "is empowered, in its discretion, to accept for the purpose of the World's Columbian Exposition, such site as may be selected and offered, and such plans and specifications of buildings, to be erected for such purpose at the expense of and tendered by the corporation organized under the laws of the state of Illinois, known," etc. In other words, the local corporation is to procure a site, and offer or tender it to the commission, and also to prepare plans and specifications for buildings to be erected; and the site and plans, if deemed adequate, are to be accepted by the commission. It will not do, I think, to interpret this provision as meaning only that the local corporation should select a site subject to the approval of the commission. It would have been easy to express that purpose in apt words. The words used indicate a transfer of possession. Other provisions of the act lead to the same conclusion. Numerous powers of control are given to the commissioners. They are authorized or required to allot space for the exhibitors,—an unmistakable act of possession; to appoint and prescribe the duties of the board of lady managers, and to name one or more members of all committees authorized to award prizes for exhibits produced by female labor; to modify the rules and regulations of the corporation touching rates of entrance and admission fees, or affecting the rights of exhibitors or of the public; to provide for the dedication of the buildings of the World's Columbian Exposition in Chicago, on the 12th of October, 1892, with appropriate ceremonies; to determine at what time, not later than October 30, 1893, the exposition shall finally close; to adopt regulations to be communicated by the president of the United States to diplomatic representatives of foreign nations; and to make reports from time to time to the president of the progress of the work, and in a final report to present a full exhibit of the results of the exposition. Besides these powers of general control vested in the commission, other provisions of the act are significant. The government itself, it is provided, shall erect buildings upon the grounds, including a life-saving station, which is to be removed at the end of the exposition, and placed elsewhere, and also shall make large national exhibits. Foreign goods subject to duty are to be admitted under regulations to be established by the treasury department. On the other hand, the local corporation, which also receives its powers from congress, is given only subordinate authority. The chief power conferred upon it is to establish rules, and is expressed in this wise:

"That after the plans of said exposition shall be prepared by said corporation and approved by said commission, the rules and regulations of said corporation governing rates for entrance and admission fees, or otherwise affecting the rights and privileges or interests of the exhibitors or the public, shall be fixed or established by said corporation, subject, however, to such modification, if any, as may be imposed by the majority of said commissioners."

In short, the commissioners have supervision and final authority in respect to the rules under which the fair shall be conducted.

I may as well state here my opinion concerning the question of the repeal of the rule for Sunday closing. It seems that after the enactment by congress of the act of 1892, making a donation of $2,500,000 in souvenir coins, a rule such as congress contemplated was adopted. At a later date an attempt at repeal was made, and, it is insisted, was successful. It is true, I think, as contended by counsel, that the right to originate rules is in the local corporation, and, generally speaking, rules so originated will be in force until the commissioners modify or reject them; but a proper interpretation of the act requires a qualification of that proposition. In order that the authority of the commission in this respect may be effective, it must be that, once the commission has modified or declared a rule upon a particular subject, that rule may not be changed or repealed without the approval of the commission; otherwise, once the commission has adjourned, the local board can annul its action by adopting or re-enacting rules to its own liking. It is not claimed that the consent of a majority of the commissioners was given to the repeal of the rule for Sunday closing, and, that being so, irrespective of other considerations, it must be held, I think, that the rule remains in force.

But to return to the question of possession. That congress itself understood that the effect of the act of April 25, 1890, was to put the exposition under national control is indicated by the twenty-first section of the act, in which it is declared that nothing in the act shall be construed to "override or interfere with the laws of the state." For that provision, in the absence of national possession of the exposition grounds, there was no necessity. It has no significance unless it was intended to keep in force the state laws for the preservation of the peace within the grounds, notwithstanding the possession taken by the government; the general rule being that when the United States, with the consent of a state, has taken possession of territory within the state for a national purpose, the state laws cease to have effect therein, except as provided by section 5391 of the Revised Statutes of the United States. The possession in this instance having been taken only for a temporary use, congress wisely provided against any suspension or exclusion of the laws and police powers of the state. The act of June 1, 1872, contained a like provision concerning the Centennial Exposition held at Philadelphia in 1876. It cannot be that this provision in the act of 1890 has reference to the law for the establishment of Jackson Park, and to the right therein given to citizens of "free access forever," because that right, unless lawfully suspended, is necessarily overridden by the establishment of the exposition in the park. If these views are right, there can be no doubt of the power of congress to make, or to require the national commission to adopt, any proper rule concerning the use of the grounds, or for the conduct and management of the fair. If this is not so, then congress had no right to say that the exposition should be open to the public as early as the 1st of May, 1893; or that it should be finally closed,

in the discretion of the commission, not later than the 30th day of October, 1893; nor to confer upon the commission any of the important powers which have been enumerated; and, if it sees fit, the local corporation may repudiate all restraint and disregard every provision of the statute, and the government be without remedy.

In preparing for the Centennial celebration, congress, in 1871, created a commission like this one, and gave it substantially the same powers, but provided that the government should be liable for no expenses whatever. By the present act the government's liability upon any and all accounts is not to exceed $1,500,000. By the act passed June 1, 1872, for the purpose of enabling the people of the United States to raise the money to meet the expenses of the celebration of 1876, a board of finance was incorporated, and authorized to issue stock. That board of finance bore essentially the same relation to the commission then appointed that the corporation, the World's Columbian Exposition, bears to the present commission. Instead of a body created by congress to raise money for the purpose of meeting the expenses of this exposition, the local corporation, organized for the purpose, assumed that duty, and was clothed by congress with certain powers and duties, both in respect to preliminary preparations and in respect to the conduct of the exposition. It is provided that the commission shall not accept the site and plans tendered until satisfactory assurance is given by this corporation that a certain amount of money has been raised or secured. That, however, cannot be regarded as a limitation of the amount of money which the corporation undertook to provide, nor of the liability which it might be required to incur. That corporation was the only body behind the enterprise consenting to be financially responsible for what should be done. Congress having declared a maximum limit of the expenditure which might be made on its account, the local corporation must have understood that it would become liable for all obligations beyond that limit, whether created by itself or by the commission acting within the scope of the general scheme. All acts of the government in the way of providing for the erection of buildings, or making exhibits, and all appropriations by congress, are in the nature of gifts, on the one hand, to the public for educational uses, and, on the other hand, to the corporation for the purpose of financial aid. The government proposed to build certain structures, and to make certain exhibits, and to grant appropriations. They are all gifts to the undertaking.

The legal relation of the local corporation to the government in respect to the question of possession is like that of a servant to a master. The possession of a servant is incident to the service to be performed, and does not, in the legal sense, constitute a tenancy. The distinction is recognized and illustrated in both English and American decisions, some of which are cited in Kerrains v. People, 60 N. Y. 221, and in Chatard v. O'Donovan, 80 Ind. 20. The servant alone may be in visible possession, exercising apparently complete control of house or land, and yet the technical possession be in the master. In this case, neither party being a natural person, the visible possession is necessarily held by agents; but, as the com-

mission, which directly represents the government, has a supervising power over the doings of the local directory, the possession, it is clear, is in the government. Indeed, if this were not so, it is doubtful whether congress had power to appropriate money in aid of the project; and, the power being conceded, the impolicy of exercising it without asserting governmental control would be manifest. To illustrate by this case: If the ordinance granting the park for the site of the fair was void from the beginning, the World's Columbian Exposition and the United States, the different states and foreign nations, were bound to know it, and in taking possession of the park to erect buildings were willful trespassers, and the buildings belong to the park, and may not be removed without the consent of the park commissioners. Counsel, in order to escape an admission of national possession, was forced at the argument to assert that, if the local corporation were ejected from Jackson Park,—and the suit of Clingman in the state court, carried to logical success, means that,—the government, with its foreign guests, would thereby be put out. It follows, of course, that if the corporation, whether holding possession wrongfully or rightfully, should go out voluntarily, the government and all exhibitors would have to go too, and the exposition be brought to an end. Or if the local corporation, being in possession, and being or being alleged to be insolvent, should be put into the hands of a receiver by any court of competent jurisdiction, whether local or national, the control and management would pass under the direction of the court which obtained jurisdiction. It is not to be believed that congress intended to expose either the property or the honor of the nation to such possibilities, not to say present dangers. But, if it has not done so, it is because it has placed the exposition, buildings, and grounds under national control, to be maintained to the end. It may be that the national commission and local directors, in order to avoid conflicts of authority or action, have found it necessary, as a modus vivendi, to agree upon plans whereby the actual conduct and management of the affairs of the exposition have been left mainly to the officers and agents of the corporation; but, no matter what may have been done in that way, the proposition remains unaffected that the government has the legal possession, the corporation having only subordinate rights, and owing obedience to regulations adopted in conformity with the requirements or enactments of congress.

The next question is, what has congress done in respect to Sunday closing? And that brings us to the act of August 5, 1892, upon which, and upon what has been done under it, this controversy, I suppose, must in the main turn. By that act, congress made a donation of $2,500,000, with the proviso that, if the gift were accepted, the exposition should be closed, or rather that the commission should adopt a rule that it be closed, to the public on Sundays. The gift was accepted, and the rule adopted. The act contained a second appropriation of $103,000 for the payment of expenses in connection with medals, and on the same day another act was passed, making, upon the same condition, an appropriation

of $800,000, which necessarily operated as a gift to the corporation, because it reduced to that extent the expenses the corporation otherwise would have had to bear.   Passed on the same day, these acts should be read as one, and the condition and declaration of acceptance thereof should be regarded, I think, as embracing all the appropriations so made.   But whether that be so or not, the appropriation of $2,500,000, it is conceded, was made on the condition stated, and the rule was adopted which congress required, and which, as I have already said, has not been repealed.   It is claimed, however, that the rule ought not to be binding longer, because congress has withheld $570,880 of the souvenir coins appropriated by the act of August 5, 1892.   Has congress in that particular been guilty of unjust conduct which disqualifies the government from seeking equitable relief?   The question has been argued as if this gift or appropriation of $2,500,000 was in the nature of a contract, as if the government had bargained with the local corporation for the closing of the gates on Sunday; and it is insisted that, having withheld a part of the price, the government is not entitled to specific performance of the contract, or to relief of that nature.   I do not think it at all permissible to speak of the transaction as a matter of contract.   The simple fact is that by reason of the enlarged plans and scope of the exposition greater expenditures of money were required than it was at first supposed would be necessary.   Congress was appealed to to give further relief, but in the meanwhile, as we know historically and by the discussion here, the question of Sunday opening had begun to be agitated.   Whether influenced by the sentiment against such opening or by other considerations it would be irrelevant to inquire, but congress, in extending further aid, saw fit to couple with it the condition and requirement that the exposition should be closed on Sundays.   Without making the gift, the government, as I think, might at any time have enacted or required the adoption of this rule; but it had not chosen to do so.   It did not choose to do so now absolutely; but, the occasion calling for further help, congress gave it on the condition stated, and, in addition, required the adoption of the rule for Sunday closing.   I quote from the act:

"It is hereby declared that all appropriations herein made for or pertaining to the World's Columbian Exposition are made upon the condition that the said exposition shall not be open to the public on the first day of the week, commonly called Sunday."

Now, whether it be called a contract or a gift, if congress had meant to affix to it simply a condition, so that the government should have only the remedies which follow the breach of such condition, the provision should have ended with what I have read.   It was not necessary to go further.   The act goes further, however, and says:

"If said appropriation be accepted by the corporation of the state of Illinois, known as the 'World's Columbian Exposition,' upon that condition, it shall be and is hereby made the duty of the World's Columbian Commission, created by the act of congress of April 25, 1890, to make such rules or modifications of rules of said corporation, as shall require the closing of the exposition on said first day of the week, commonly called Sunday."

—That is to say, congress went further than merely to prescribe a condition to its gift. It exerted its legislative authority by requiring the commission to adopt this rule. Ignoring in this instance the right of the local corporation to propose rules, congress left it to that body to accept the gift on the condition proposed, or not, as it chose, but imposed on another body, the national commission alone, the duty and power, in the event of such acceptance, to adopt a rule for closing on Sundays. The rule was adopted, and, independently of the proposition that it has never been repealed, it is, in my judgment, quite clear that, having been adopted in obedience to the requirement of congress, it cannot be repealed, either by the commission or the local directory or by their conjoint action.

But under the act of 1893 a part of the souvenir coins given by the act of 1892, it is insisted, has been retained unjustly and unlawfully. It may be questionable whether injustice may be so attributed to congress, or whether the government, the national sovereign, can be turned out of a court of equity on the suggestion that its hands are unclean. But waive that. I have already said that the local corporation is liable for all obligations beyond the sum of $1,500,000, except such as congress may have provided for or assumed by enactments later than that of April 25, 1890. The corporation, therefore, was responsible for the expenses of the awards, and, if congress kept back a part of the money for the purpose of paying those expenses, the effect was simply to direct the application of its gift to the discharge of obligations of this corporation for the payment of which the government might be considered bound in honor, though not in law. Assuming that that was done, was it such a breach of duty on the part of congress as to affect or destroy the force of the condition on which the souvenir coins were appropriated? In my judgment, it was not. The act in question, however, does not go so far as assumed. After providing for a loan of $570,880, to be used in payment of the awards in question, it says:

"The sum of $570,880 shall be a charge against the World's Columbian Exposition, and of the moneys appropriated for the benefit of the World's Columbian Exposition, amounting to $2,500,000, under the act of August 5, 1892, $570,880 shall be retained by the secretary of the treasury until the World's Columbian Exposition shall have furnished to the satisfaction of the secretary of the treasury full and adequate security for the return or repayment of the $570,880," etc.

The section in which this language is found begins by saying, "To enable the commission and board of lady managers to pay the awards," but ends by requiring a security from the local corporation for the return or repayment of the money; so that it was left to the option of the corporation, by giving or refusing to give the security, to accept or reject the loan. It refused to give the security, and that was an end, practically, of the proposition to make the loan. The souvenir coins were directed to be retained until the required security had been given, and when the corporation refused to give the security it seems to me to be the proper

conclusion—with all due deference to the opinion given out from the office of the attorney general—that the right to withhold the coins ceased. That is to say, under the terms of the act the treasury department was bound, and is bound now, upon demand, to surrender those coins to the corporation, or to the commission, for use according to 'the original design. This must be so, unless the corporation still has the right, upon giving the security, to receive the proposed loan. It is argued, and I believe was the opinion of the solicitor general, that the ultimate purpose of congress was to secure the payment of the awards by the corporation, and that the coins should be retained to secure that result, though the loan was not accepted. Doubtless it was the expectation of congress that the proffered loan would be accepted and used to pay the expenses of the awards; and, if that had been done, the government would have had security for the repayment of its loan. But the act makes no provision for the refusal of the commission or of the corporation to accept and give security for the repayment of the loan, nor, in that event, for payment of the expenses of awards; and it was not competent for the treasury department, in order to meet an emergency which had not been foreseen, to adopt a construction of the act designed to effect a supposed ultimate purpose of congress in a manner which is not authorized, either expressly or inferentially, by the language used. This being so, there has been no legal retention of the souvenir coins, and the unauthorized acts of administrative officers cannot be allowed to put the government in the attitude of withholding unjustly what it had promised to give. German Bank v. U. S., 148 U. S. 573, 13 Sup. Ct. Rep. 702. Unless unavoidable, a construction should not be put upon the statute by which the nation will be made a wrongdoer, and a declared public policy overturned. It seems to me quite clear that there has been no breach of obligation on the part of the government, nor any conduct in respect to this matter, of which there may be just complaint. But, if it be conceded that a part of the souvenir coins were wrongfully withheld, the condition of the gift was a continuing one, attaching to each installment of the money as delivered; and by accepting, as it did, further installments after it had full knowledge of the interpretation which had been put upon the act of 1893, the corporation, if ever released, came under renewed obligation to observe the condition. The resolution to return the coins received, after payment of other liabilities supposed to have preference, in no manner affects the legal or equitable status of the parties in respect to this condition. A tender, to be effective, must be unconditional.

The next question is of the right of the government to seek relief in a court of equity. It results from what I have already said, if my views are right, that there is no want of equity in the government's case. The government has sufficient interests at stake, because it has possession of the grounds, has property there, and has pecuniary interests in imported goods subject to duty, and also indirectly in the gate receipts and income from all sources; and, besides, is under the highest obligations of honor and law to

protect the property and interests of foreign nations and of the several states of the Union, and of all exhibitors brought there upon its invitation. Every open day brings its risks of loss by fire, theft, fraud, and the certainty of additional expense. Having such possession and interests and obligations, and having no other means of enforcing obedience to its regulations, the government is entitled to the assistance of the court. It is not a question of the enforcement of a criminal statute. If it were, it is well understood the aid of a court of equity could not be invoked. In my view, the government has the same right to maintain its possession, and to supervise the management of the exposition, that it has in respect to the building in which we are sitting. Its title and possession, it is true, are temporary, but the necessity for relief in the mode asked is only the more urgent on that account. Pecuniary interests, sufficient to warrant an appeal to equity, are plain enough, and it is not material to the question of jurisdiction—it is not for the court to inquire—whether those interests are likely to be affected advantageously or disadvantageously by the unlawful conduct which it is sought to enjoin. There are other rights and interests quite as sacred as dollars, and equity protects against injuries which cannot be measured in money. The case of U. S. v. W. U. Tel. Co., 50 Fed. Rep. 28, affords an instructive illustration. The suit was to cancel an agreement between that company and the Union Pacific Railway Company, whereby the telegraphic franchise of the railway company was improperly transferred to the telegraph company, and to compel the railway company, in obedience to its charter, to exercise that franchise directly through its own officers and employes. It was insisted in argument, and was conceded by the court, that the contract was pecuniarily beneficial to the railway, and also to the government, as second mortgagee of the company's property; but the court, by Justice Brewer, said:

"The government is, it is true, pecuniarily interested as second mortgagee; but a higher interest is that the administration of its franchises should redound to the general welfare, and not merely to the pecuniary interest, of its grantee, or even of itself. The dollar is not always the test of the real interest. It may properly be sacrificed if anything of higher value be thereby attained. But whether the dollar be gained or lost is not, in a matter of this kind, a question for the courts. It is for the legislative branch, as representative of the popular will, to settle all such questions. Given power to act in the legislature, and its mandatory action, the simple province of the courts is to enforce such mandate, and they have no revisory determination as to the wisdom or folly of the commanded act. * * * Neither can there be any question in this case of the right of the government to maintain this bill. It was the creator of the railway corporation defendant, and a large contributor to its finances. It made absolutely a large grant of lands. It loaned its own bonds, and holds to-day a second mortgage. By reason of its governmental duty to regulate the affairs of this corporation, and also its pecuniary interest in their successful management, it may properly legislate in respect thereto, and invoke the aid of the court to compel compliance with its determination. And when it is the complainant the inquiry is different and broader than when the corporations themselves are the contesting parties, or when only individuals are challenging their action. The supervisory power of the government is plenary, and its commands to its corporate creations must be enforced, unless they trespass upon some vested rights of property. * * *

.It is urged that if a duty is cast upon these corporations, it must be enforced by mandamus. * * * A court of equity, with its flexible procedure, can alone meet all the exigencies. The jurisdiction of such a court seems to me necessary and unquestionable."

The right of the government to maintain a bill in equity on the ground of obligation or duty either to an individual or to the public, when it had no pecuniary interest, has been affirmed in several instances by the supreme court. U. S. v. San Jacinto Tin Co., 125 U. S. 273, 8 Sup. Ct. Rep. 850; U. S. v. Beebe, 127 U. S. 338, 8 Sup. Ct. Rep. 1083; U. S. v. Marshall Silver Min. Co., 129 U. S. 579, 9 Sup. Ct. Rep. 343; Curtner v. U. S., 149 U. S. 662, 13 Sup. Ct. Rep. 985, 1041.

There is another ground on which the right to apply to a court of equity in this case seems clear. Whatever possession of the grounds the government may be considered to have, (and that it has a qualified possession I do not understand to be questioned,) it has made a donation. In my judgment, it has made numerous donations, but confessedly it has made one of $2,500,000; and the enterprise to which it was made is one which may well be regarded as of the nature of a charitable trust, or scheme for the public education. That donation was made and accepted upon a condition which has been broken, and, like a private individual under similar circumstances, the government need not reclaim its gift, but has a right to come into a court of equity to have the condition enforced. The donation is none the less charitable because it was made to a corporation; that corporation, like a college or hospital, having been formed for the very purpose of effecting the charitable design.

One word in respect to the action of the state court. The United States is not a party to that procedure, and the case is still pending. The injunction granted was only preliminary, and I am not sure but that it has expired by lapse of time; but, whether it has expired or not, it is no bar to this action. If we are bound by it at all, it is only by way of comity or courtesy. I take it, however, that in respect to great designs like this, which are to be accomplished within a short time, and for which the government, besides making large appropriations, has assumed all moral responsibility, and, as I think, has the responsibility of control, it would be entirely inadmissible to hold that the courts of the United States, when called upon to protect the national interest and supremacy, must, out of comity, yield to an attempt by a state court to take jurisdiction, and to make and enforce orders designed to cover the period of the existence of the enterprise. If I am right in respect to the possession, the state court has no more right to pass judgment concerning the opening or closing or any other act of management of the fair or fair grounds than it would have with respect to the doors of a post office or customhouse. It is not a question of the United States exercising authority over local corporations; it is a question of its having authority over grounds which a local corporation has delivered into its possession for a national use, and of which that corporation itself had received possession only for the purpose

of making that delivery. It is provided, in effect, in the act of the legislature of the state, as well as in the ordinance of the park commissioners, that the park shall be granted or leased to the local corporation to be used as the site of this exposition, and for that use only. The corporation took possession only for the purpose of devoting the grounds to that use, in accordance with the act of congress, under which, as I think the act must be construed, the possession of the government is beyond dispute. And on that theory, and even if the government, as has been contended, is in joint possession with the local corporation, the duty and power of the court to protect the government against violation of the rule in question or of other rules for the conduct of the fair, and against any effort on the part of the state courts to interfere, ought not to be doubtful.

My opinion is that the relief prayed ought to be granted.

In respect to the motion for a supersedeas pending an appeal, it is urged that a suspension of the injunction cannot harm the complainant, and that, on the other hand, if the injunction is wrongful, great pecuniary loss to the respondent corporation is inevitable, because the government cannot be required to give bond for the payment of damages. Whether a supersedeas shall be granted is, ordinarily, at least, a matter of discretion. To grant it in this case, it may be, would do the government and the public no pecuniary harm; but for the time of the suspension it would deprive the government irretrievably of the relief which it seeks, and to which we have found it entitled. If we are wrong in our views of the case, the corporation is not without ample security for the payment of such damages as it shall suffer by reason of the closing of the gates of the exposition under our order pending the appeal. It has in its possession the proceeds of nearly $2,000,000 of souvenir coins, which, if right in its contention, it should return, and has declared its purpose to return, to the government, and from which, in that event, it may deduct compensation for all damages which it shall suffer.

JENKINS, Circuit Judge, (orally.) In order to a just determination of the questions involved in this application for an injunction we must first endeavor to ascertain accurately the relations which the government of the United States on the one hand and the World's Columbian Exposition upon the other bear to this enterprise. It is matter of history that the celebration of the 400th anniversary of the discovery of America by Columbus was a subject of general interest and discussion, and the different localities throughout the United States vied with each other in having the exposition (anticipated) located as the particular localities desired. The city of Chicago and the people of the state of Illinois were desirous that this exposition should be located at the city of Chicago, and in aid of that effort a corporation was formed under the laws of the state of Illinois for the purpose of carrying on such an exposition if congress could be induced to locate it at the city of Chicago, and that effort on the part of the people of Illinois,

and particularly of the people of the city of Chicago, was successful so far as to induce congress to locate that exposition at the city of Chicago. That corporation was formed for the purpose of carrying on to a successful issue that exposition, which it was desired that congress should sanction and inaugurate. The congress of the United States, on the part of the government of the United States, undertook certain relations with respect to that exposition, and we must look to the terms of the act of congress to determine just what those relations were. The preamble of the act of April 25, 1890, (26 Stat. c, 156,) recognizes the fitness and the appropriateness of the celebration of that anniversary by an exhibition of the resources of the people of the United States and of the states, of their development, and of their progress in civilization. It recognizes that such an exhibition should be of a national and of an international character, so that the whole civilized world might participate therein, and it recognized the appropriateness and the fitness that such an exposition should have the sanction of the congress of the United States. The act thereupon declares that such an exhibition should be inaugurated. It provided for the appointment of commissioners, and defined their duties. They were to accept, on behalf of the government, for the purposes of the proposed exposition, such site as should be selected and offered, and such plans and specifications of buildings, to be erected for such purposes at the expense of and tendered by the corporation now known as the "World's Columbian Exposition," provided that the site so tendered and the buildings proposed to be erected thereon should be deemed by the commission adequate to the purposes of the exposition. It is thus manifest to me that congress was careful in guarding the national honor, and to provide that the question of the selection of the site and its appropriateness to the purpose designed should be determined by persons of its own choice, and not by the corporation that was to obtain the site and construct the buildings; and also that the plan and the character of the buildings to be constructed by the local corporation should be such as by the commission should be deemed appropriate to the exposition to which the government lent its sanction. And, in further regard for the national honor and the national sanction which was given to this exposition, congress provided that that commission should be satisfied that this corporation was financially able to carry into effect and into successful operation the enterprise which it proposed. When that had been done, when the plans and specifications which the local corporation should devise had been accepted, and the site accepted by the commission, and the commission was satisfied that there was sufficient financial ability behind the enterprise to insure its success, then to the commission was awarded the duty of allotting space for exhibitors, to classify the exhibits, to determine the plan and the scope of the exposition, to appoint judges and examiners for the exposition, the award of premiums, if any, and generally to have charge of all intercourse with the exhibitors and representatives of foreign nations. That was in order, as it has seemed to me, that the national

honor should be protected, and to insure to the nations of the earth and to all exhibitors in that exposition an honest, impartial, and just award with respect to their exhibits. Competition was to be determined by officers selected by the United States government, and not by the local corporation. But with respect to the regulation of the ground and the buildings the local corporation should have the making of the rules, for entrance and admission fees, or otherwise affecting the rights, privileges, and interests of the exhibitors and of the public. But, in further protection of those who came there by invitation of the government of the United States, congress saw fit to provide that this commission which was appointed should have the right to supervise, approve, and modify the rules and regulations which the local corporation might pass. It further provided that when the commission should be satisfied that suitable provision for the site and suitable plans for the buildings had been prepared, and was further satisfied that the local corporation had provided in aid of that enterprise a sum of not less than $10,000,000, the commission should notify the president of the United States of those facts, and thereupon the president was authorized to proclaim to the nations of the earth the time and place of the holding of that exposition; should communicate that proclamation to the governments of the nations, through their diplomatic representatives at Washington, for publication in their respective countries; and should, in behalf of the government and people of this nation, invite foreign nations to take part in the enterprise. The statute also provided for a government exhibit, and for a government building for the purposes of that exhibit. It gave to this enterprise a national character; it impressed upon it the nationality of the government of the United States; it invited foreign nations and foreign peoples to come here and participate in it. But the management of the exposition, the construction of the buildings, and the expenses of the exposition, were to be borne by and the receipts held by the local corporation. In the act of congress it is provided that the United States should not be liable for any of the acts, doings, or liabilities of the local corporation, or for any of the debts, liabilities, or expenses of any kind whatever attending such corporation, or accruing by reason of the same. It provided for the erection of the government building at the expense of the government, and provided that the government should not be liable on account of the erection of buildings, the expenses of the commission, of any of its officers or employes, or on account of any of the expenses incident to or growing out of said exposition, for a sum exceeding $1,500,000; and provided that nothing in the act should be construed to create any liability of the United States, direct or indirect, for any debt or obligation incurred, nor for any claim for aid or pecuniary assistance from the congress or the treasurer of the United States in support or liquidation of any debts or obligations created by the commission in excess of the appropriations made by congress. Then the substance of the legislation is this: That congress, having sanctioned this enterprise, having bestowed upon it a national character, having authorized

the president to invite foreign nations and people to visit it, gave from its funds, in aid of the enterprise, the sum of $1,500,000.

I need not here enter into a discussion of the ground covered by Judge WOODS with respect to possession. I rest my decision of this case upon other grounds. I have doubted whether there was anything more than a qualified possession in the United States of America, and whether, upon the ground of that qualified possession, it could, at its will, enact such laws as it deemed proper with reference to the government of the grounds; but I express neither assent to nor dissent from the opinion expressed by Judge WOODS, for I do not, in the view which I have taken, conceive that the disposition of the case hinges upon that ground.

We start, then, with the character of this scheme carried on and operated by this local corporation, but having the sanction of the government, fostered by the government, and money granted in aid of the enterprise by the government as a donation or gift to the local corporation. I cannot conceive it to be anything in the shape of a partnership between the government of the United States and the Illinois corporation, nor can I look upon any of the transactions between the government and this local corporation as a contract such as might obtain between private parties. It was a nation granting aid to a local corporation that was engaged in a great public, benevolent, instructive exhibition of the progress made by the United States of America; and that corporation, outside of the grant of such gift and such bounty as the United States government might bestow upon it, was to bear the expenses of that exposition, and reap the profits, if any.

As time progressed it was found, as is usually the case with such enterprises, that the scheme had outgrown the financial means of the corporation, and an appeal was made to congress and recognized by congress for further aid to that enterprise. On August 5, 1892, congress further provided that for the purpose of aiding in defraying the cost of completing the work of preparation for the inauguration of that enterprise to which the national honor had been committed there should be delivered to the World's Columbian Exposition $2,500,000 in the souvenir coins provided by the act, and also provided for bronze medals and diplomas, which were to be delivered to the World's Fair Commissioners to be awarded by them. It then provided, by section 4, the condition which presents the main question around which cluster the controversies in this case, viz.: That all appropriations are made on the condition that the exposition shall not be open to the public on the first day of the week, commonly called Sunday; and, if the appropriation should be accepted by the World's Columbian Exposition, it was made the duty of the commissioners to modify or pass such rules as shall require that the exposition be closed on that day.

It is said that this legislation by congress is without the power of congress; that it is unconstitutional; that it seeks to establish religious tests. I cannot concur in the objection. Legislation with respect to the first day of the week has nothing to do with the

matter of religious tests or the compulsion of a particular religious belief or service. It is founded upon the necessities of the human race, as taught by experience, the needed rest which human beings require from the avocations of six days' labor; and it is justified by that experience, outside of and irrespective of any question of creed or any question of religion; and all that the laws seek to do —the laws of the several states which have existed almost from the existence of the states—is to provide for that needed rest, and to provide for noninterruption in that rest and in such religious services in which any citizen may choose to indulge. It is not an imposition upon any one of compulsion in respect to religious belief, or in respect to attendance at church. It provides simply for the protection and for the peace of those who may choose to attend church, that they shall not be interrupted by labor on that day. This gift was a gift upon a condition,—a gift of $2,500,-000, upon the condition that the World's Fair should be closed upon the first day of the week. Any one has a right to annex to a gift such condition as he may deem proper, so long as that condition is not immoral or illegal. If one chooses to bestow $10,000 upon a hospital for free beds to be maintained in that hospital upon the condition that they shall be occupied by no one not of the Presbyterian faith,—whatever may be said of the narrowness and bigotry of such a condition,—it is perfectly legal for the donor to annex it as a condition to his gift. We have a well-known illustration of that rule in the celebrated case of the Girard Will, 2 How. 127, where the donor founded an institution of learning, granting to it large sums of money upon condition that no minister of any sect should ever hold or exercise any station or duty whatever in the college, and that institution has been maintained for years, and ministers excluded, because, as it was held, the donor had a right to annex as a condition to that gift any condition that he saw proper, provided that it was not illegal or immoral. This gift was accepted by the local corporation, and in conformity with the act the local board passed its rules for the closing of the exposition on the first day of the week, and has received a large sum of money under that act while its rule was in effect, if it has ever been altered. It is said that, although this be so, still, if they have broken faith with the government; if, receiving this money with the condition attached to the gift, they have failed in the performance of that condition,—there is a remedy in the United States government at law to recover back the money which was granted, as upon a condition broken, and that chancery has no jurisdiction in such a case, there being ample remedy at law for damages resulting from the breach of this condition. Ever since the statute of Elizabeth, and, indeed, as it has been determined, before, if this can be construed to be a charitable bequest, courts of chancery have original inherent jurisdiction to enforce the appropriate use of the money given, and the conditions under which it was given. Mr. Justice Gray, now of the supreme court of the United States, has determined that such a gift came within the definition of charitable bequests. He says:

"A charity, in a legal sense, may be more fully defined as a gift to be applied consistently with existing laws for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of religion or education, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government. It is immaterial whether the purpose is called 'charitable' in the gift itself if it is so described as to show that it is charitable in its nature." Jackson v. Phillips, 14 Allen, 539, 556.

It has been held in a large number of cases that gifts for educational purposes, gifts for the advancement of learning, gifts for the diffusion of useful knowledge, gifts for the civilization of the Indians, gifts for assisting literary persons in their pursuits, are all such gifts as come within the definition of charitable bequests. So, also, it has been held that gifts to the British Museum come within that clause. British Museum v. White, 2 Sim. & S. 594. So, also, it was held in England that a gift by an English subject to the president of the United States in aid of the Smithsonian Institute at Washington came within the definition of a gift for a charitable purpose, and was within the jurisdiction of a court of chancery to see that that money was appropriated and bestowed for that purpose. President v. Drummond, cited in Whicker v. Hume, 7 H. L. Cas. 124. There is an observation by Lord Justice Selwyn in Beaumont v. Oliveira, 4 Ch. App. 309, which states the doctrine thus:

"In the case now before us, both bequests are bequests to corporations, the object and purposes of which are the diffusion and improvement of particular branches of knowledge. They subsist for these purposes and no others; therefore for public purposes; therefore for the advancement of objects of general public utility; therefore for purposes analogous and similar to those mentioned in the statute of Elizabeth; therefore for charitable purposes; and therefore they come within the jurisdiction of the court of chancery."

A court of chancery has inherent jurisdiction to see to it that the gift is applied in the manner designated by the donor, and that the conditions of the gift are observed by the donee. So I reach the conclusion that this appropriation of $2,500,000 of souvenir coins was a gift to the local corporation upon condition, and that a court of chancery is authorized to see to it that that condition of the gift is enforced and observed.

That brings us to the question whether the United States of America has done anything inequitable which should prevent the interposition of a court of equity; for, however strong the right, however the government may determine the conditions of a gift, if it has acted oppressively or inequitably, it has no right to claim the interposition of a court of equity any more than a private individual. It is provided in the act of 1893—which is not couched in that clearness of statement that is to be desired, and concerning the construction of which there can well be much divergence of opinion—that congress proposed to loan to this World's Columbian Exposition a certain sum of money for the payment of certain expenses of this exposition, and required a bond from the local corporation for the return of that money within a specified time, and it provided that no portion of that appropriation should be avail-

able until that bond was given, and it also provided that a similar sum should be retained from the appropriation or gift of $2,500,000 until the exposition company should have furnished full and adequate security for the return of the money. It is very difficult to construe that act upon its terms, and I do not—I cannot—agree with my Brother WOODS that, upon declining to give that bond, the World's Columbian Exposition would be entitled to draw from the treasury of the United States the sum retained. As I construe the act, congress proposed to loan to the exposition this sum of money upon condition of receiving a bond as security for its return. It considered itself bound in honor—the honor of the nation pledged to the governments of the world—for the appropriate conduct with respect to exhibitors of foreign nations in regard to the awards of diplomas and of medals, and in regard to a jury of awards that should be impartial and that should justly determine between the exhibits of citizens of this land and citizens of other lands. Its national honor was involved, and it has claimed the right to retain from the gift, which it had before granted, such a sum of money as should cover the expenses of that award, directing that money to the payment of those expenses if the local directors should fail to pay those expenses; and I think with Attorney General Olney that the meaning of that act is that when that bond was given the money should be granted to the exposition company for the purpose indicated, and that, failing the giving of such bond, the government reserved a sum sufficient in its judgment to pay those expenses for which it was in honor bound, with respect, not to the local corporation, but to the peoples who, by virtue of the proclamation of the president of the United States, had been invited to participate in this exposition. Then, if this exposition company—this local corporation—was not bound to pay the expenses of the jury of awards, if that was an expense which devolved upon the government and should be borne by the government, beyond any question the complainant has no standing in a court of equity, however much it may have a right to enforce the provision with respect to closing upon Sunday, because the government no less than an individual must come into a court of equity with clean hands. I think the whole case hinges just on this question: whether those expenses were expenses which the local corporation were legally bound to pay, or whether they were such expenses as the United States government should pay. And my construction of the act has led me to the conclusion that all that the government has done by legislation has been to make certain gifts of money to this local corporation, and in aid of this enterprise; that it has bound itself no further, and that all legal liability for the payment of the expenses of that exposition, outside of the question of the amount which the government has appropriated, are imposed upon and are the debts of the local corporation, and not of the United States government; and that, therefore, the government only did what it had a right to do in the preservation and protection of the national honor, and of the character which it had bestowed on this exposition.

There is this to be said on the question of equity,—though it does

not cut much of a figure in the disposition of the case,—and that is, that this local corporation had accepted part of this gift of souvenir coins after the legislation of 1893, granting to it this sum of five hundred and odd thousand dollars, and retaining a like amount from the appropriation of 1892. It is said that the World's Columbian Exposition has tendered this sum back. I need hardly spend time in commenting on that. A promise to pay back is not a tender; a promise to pay the government $2,500,000 after all the expenses and liabilities of the exposition corporation are paid is not a tender back of $2,500,000 to the government. There is but one way to tender, and that is to tender, not to promise.

I also agree with my Brother WOODS on the proposition that this resolution to open the gates on the first day of the week was not legally passed. I think that when it has been provided by the original act under which the corporation has proceeded that its rules with respect to the government of the ground should have the sanction of a majority of the board of commissioners it cannot change the rules approved or modified by the commissioners the moment the backs of the commissioners are turned, and wait for a further modification by those commissioners. That might render all rules inoperative and nugatory. When once the rule had been sanctioned and adopted by the commissioners, it required a like solemnity for modification or repeal; and I am of the opinion that the resolution which was passed did not receive the sanction of the majority of the commissioners, and is inoperative.

I need only add with reference to the action of the state court, which is pressed upon our attention, and which we are urged, through motives of comity, to follow, that the government of the United States was not before that court; and while for one I fully recognize the right and jurisdiction of a state court over a subject properly before it, when it has jurisdiction of the parties and the subject-matter, there can exist at this day no sort of question that the United States of America has the right to use the courts of its own jurisdiction for the determination of its rights, and that a state court cannot by any proceeding between private parties undertake to adjudicate upon those rights, or by its injunction nullify the rights of the government of the United States.

I am therefore of the opinion, upon the grounds which I have stated, that this injunction prayed for should issue.

GROSSCUP, District Judge, (dissenting.) I concur with my Brother JENKINS that the purposes for which the government was given a voice in the selection of the site, in determining the size and character of the buildings, and in modifying such rules and regulations respecting the grounds as the local corporation might adopt, was to protect the honor of the United States; and I hold with him, too, that the exposition is to be national; that it is under the auspices of the United States, both as a government and as a people.

But this alone throws little light on the controversy, for the national character of the enterprise is not dependent upon its being exclusively governmental. It is in the nature of American

thought and purpose that a commemorative national enterprise should be undertaken and carried on directly by the people, with the aid and sanction of the government, it is true, but not as a governmental work. Such was the legal view taken of the exhibition at Philadelphia by the supreme court, an exhibition commemorative of the beginning of national history, and therefore a peculiarly national enterprise.

The act of congress of April 25, 1890, adopted the Illinois corporation as an embodiment of the popular movement, and, in connection therewith, made provision on the part of the government for the holding of the exposition. In that act the respective parts of the government and the Illinois corporation in the creation and control of the exhibition were plainly marked. The government, through its commission, was to determine the plan and scope of the exposition; allot space for and classify the exhibits; appoint judges; award premiums, and generally have charge of all intercourse with exhibitors and the representatives of foreign nations. To the Illinois corporation was left the duty of procuring and preparing a site, and the erection of such buildings as were necessary to suitably house the exhibits. Did congress thereby intend to include the Illinois corporation as one of its own agencies, and thus create and control the exhibit as a government work under exclusive governmental dominion? Plainly not. There is no express term or reasonable implication to that effect. The inferences run the other way. A national commission is created, with prescribed powers and duties, and put under a mandate to report from time to time to the government of the United States. If the corporation created by Illinois were a like agency, why should not like provisions extend to it? Why would there be no requirement for periodical or final reports? Why should there be no supervision over its agents or finances? Why should there be an express disclaimer of any liability for its debts or doings? Could any other principal repudiate, in advance, the doings and liabilities of an agent within the express scope of his powers? Could the government do so, and yet remain honorable and just? The proposition contended for involves the assumption of a relation between the government and the corporation, no element of which is found in the language of the statute, and every element of which is contrary to the principles and safeguards of the law commonly controlling such relations. If this corporation is an agent, it is the first known instance in which an agent is bound to pay all the debts of his principal; the first known instance in which the principal assumes all the moral responsibility, and repudiates all financial responsibility. In my opinion, the Illinois corporation and the government entered upon the work of this exposition, not as principal and agent, but as coworkers, each independent of the other, within the scope of the part respectively undertaken by each, except as the defendant corporation was expressly made subject to the right of control or modification of the government. Within the scope of these respective powers and duties each had dominion, and the dominion of neither was as agent for the other. It there-

fore follows that the government had no right, derived from dominion or possession, to control the closing of the gates. Its rights in that respect, if any, are found in some contract, or some condition of a donation.

I cannot find that either party was under legal obligation to the other or to the public to exceed the expenditure originally contemplated. The right of the commission to determine the plan and scope of the exposition does not include the power of enlarging, without its consent, the liability of the corporation. The responsibility of the corporation may have been enlarged, and further liability have been subsequently assumed; but such was, in legal contemplation, purely voluntary. It was because neither congress nor the corporation was willing that the exposition should fall short of its highest possibilities. The act of August, 1892, therefore, must be regarded in the light of a supplemental arrangement between the government and the corporation. By that act it was provided that, in order to enable the corporation to complete the buildings ready for the opening in May, 1893, there should be coined and delivered to the corporation, upon certain certificates respecting the progress of the work, 5,000,000 half dollars bearing a special imprint, upon condition that the corporation would show sufficient assets to carry its portion of the undertaking to a close, and on the further condition that it would close the exposition Sundays. It is immaterial whether this act, and its acceptance by the corporation, constituted a contract, a donation, or a mere appropriation. In either view it contemplated that the corporation should perform two important conditions, namely, raise, ready for use on the buildings, $5,000,000, in addition to its original expenditure, and at the same time surrender one of its privileges respecting the control of admissions for one-seventh of the time of the fair. Here, then, are the three leading elements of this contract, donation, or appropriation: The raising by the corporation, on the security of the gate receipts, of $5,000,000 additional to that already realized; the surrender of the corporation's views on the question of Sunday opening,—a concession concededly important to its directory and stockholders; and placing at the disposal of the corporation by congress of the full quantum of 5,000,000 specially designed half dollars, in time to enable their use, or that of their avails, in completing the buildings preparatory to the inauguration of the exposition on the 1st of May, 1893.

The corporation accepted the proposal, issued and sold its bonds on the pledge of the gate receipts, and passed a rule opening the gates only on six days of the week. It thus complied with all the conditions of the act. I cannot bring my mind to see that the mere acceptance of this proposal by the corporation released the government from its obligation to completely fulfill the terms defining the promises of the government. Certainly no such law or logic would be applied to the contract or donation of an individual. The formal act of acceptance may have had the effect of preventing the corporation from rightfully retiring from the arrangement as long as the government was engaged in fulfilling its promise;

but what court was ever told, until this case was argued, that an acceptance by a donee, not of the actual funds of the donation, but only of the promise of the donor, foreclosed any inquiry as to whether those promises were redeemed. The acceptance of the condition of a contract or gift implies that the terms of the contract or gift will be fully performed, and is, therefore, not beyond recall on equitable terms, when it is found that the contract or donation will not be duly performed by the party who is charged with its performance.

The next inquiry, therefore, is, did the government fulfill the terms of its contract or donation? In March, 1893, within two months of the opening of the fair, it passed an act, the effect of which was to seize upon more than 1,140,000 of these coins, without the consent of the corporation, and with the view of holding them until the close of the exposition, and then holding them permanently, unless the corporation gave security to pay the expenses of the juries of award. I can put no other construction on this act. It is the construction of the law officers of the government, the solicitor general, and approved by the attorney general. The insistence that congress only intended this act to invite the corporation to accept its proposition for a loan, but in case it was declined, meant that the secretary of the treasury should deliver the coins, as if the act had not been passed, attributes to congress simply a puerile purpose.

This raises the question, then, whether the corporation was under any obligation to pay the expenses of the juries of awards. If it was, the seizure of the coins only postponed their delivery from some period previous to May until October, and might be regarded as an unsubstantial breach of the contract or donation; but if the corporation was under no obligation to pay that expense, then the act was a direct and unjustifiable diversion of 1,140,000 of these coins.

The second section of the act of 1890 provides that the governmental agency—the commission—was to allot space for and classify the exhibits, appoint the judges and examiners, award premiums, and appoint lady managers. Section 18 carries an appropriation for the expenditures of the government, including the expenses of the commission. Section 15 expressly announces in advance that the United States will not be liable for the doings, proceedings, contracts, or expenditures of the corporation, or any of its officers or employes. It seems to me that these sections, read together, evince the purpose of congress to be responsible for the doings and the expenses of the commission, within the scope of their duties, and that those include the expenses of the lawful appointees and agents of the commission, as fully as its other expenses. Can the commission perform its prescribed duties without incurring the expenses of the judges and the examiners any more than it can classify exhibits without the expense of the necessary books and papers, or award a premium without the expense of striking or preparing some medal or token of preferment? These expenses are incidental to the rights retained. To exclude them would be to exclude the commission, for congress did not intend to call together

this body of men, and then fail to equip them with the means that were essential to their duties.

But it is said in the argument that the act limits the liability of the United States to $1,500,000, and that that sum has been already exceeded. That proviso is doubtless a mandate upon the commission and its agents and officers, in the matters enumerated, as well as upon the board appointed to prepare the government exhibit, and the secretary of the treasury, who is by sections 16 and 17 authorized to construct a life-saving station, and suitable buildings wherein to exhibit the governmental articles. But does such mandate carry with it, logically or fairly, the result that, if these officers should have exceeded the limit, the corporation should thereby be made liable for the excess or default. If so, what would prevent the secretary of the treasury from exhausting the entire amount on his several undertakings, and then casting upon the corporation the entire expenditures of the commission, including the salaries of its members, and the paper, even, on which its reports to the president are made out? I cannot believe that the congress meant that the disobedience of its own agents should be charged against the corporation whom they were to assist and watch. My conclusion, therefore, is that the act of March 3, 1893, was an unjustifiable withholding of the 1,140,000 souvenir coins, and that the corporation was thereafter under no legal or equitable compulsion to carry out the conditions of the contract, donation, or appropriation provided it in turn offered to do equity.

The offer of the corporation is to return to the government the legal tender value of these coins after it has discharged its pledge to the holders of the bonds issued upon the faith of the appropriation. Now, what better could the corporation honorably do? The payment to the government out of the first proceeds of the exposition (and its only assets are its gate receipts) would break faith with these loaners of the last $5,000,000. They knew when they parted with their money that the government appropriation was made, but were told by the act itself that no obligation for a repayment to the government was thereby created. Indeed, the government has broken faith with them as well as with the corporation, for the withholding of the coins endangered the opening of the fair on time, and thereby lessened their security. I cannot see how a court of equity could order the postponement or impairment of this pledge, and especially would it not in favor of a party who has disturbed the status quo by a breach of faith.

But is the corporation prevented from recalling a privilege surrendered simply because the intervening equities of third parties put out of its reach the possibility of the immediate return of the money to the government? I answer affirmatively if the party having the right to reclaim the money has no offending connection with the situation, but certainly not if the situation is due to its unjustifiable conduct.

But it is urged that the taking of these coins by the corporation, after the passage of the act, but before its official interpretation by the secretary of the treasury, amounts to a waiver of the breach

of congress.   I am not prepared to deny this if the party entitled to the enforcement of the condition were not at fault.   The situation here, however, is peculiar.   The act was ambiguous; so ambiguous that it required a construction of the law officers of the government; so ambiguous that of the three judges sitting there is a difference of opinion between them respecting its effect.   Is the local corporation to be held to have known precisely what that act meant, when this court is divided as to what its meaning is?   It is true that when congress enacts a law of the land the presumption is that all persons know what the law means.   That is a presumption founded upon the necessities of the enforcement of law.   But that presumption does not extend to cases where the congress is not enacting a law for the land, but is simply dealing as a contractor or donor.   When it deals as a contractor or donor its rights are no more than those of a private individual thus dealing, and until it speaks plainly enough to be understood the party with whom it is dealing is not driven to the peril of correctly interpreting its expressions.   I do not think, therefore, that the corporation, when it accepted the money under the ambiguous act of 1893, is to be held to have fairly elected to accept the condition, notwithstanding its breach by congress.   It did not know at that time but what the secretary of the treasury would put upon it the interpretation that my Brother WOODS has, and upon its refusal to give the bond would pay over the coins in time for the opening of the exposition.   The corporation, until it understood the attitude of congress, was in no situation to make an election, and especially in no situation in which an election could be forced upon it.   I think, however, that, no matter what view is to be taken of the duties of the corporation in that respect, the government is in no position to ask for such waiver.   A waiver is an equitable estoppel in favor of one who would be otherwise injured.   It cannot be enforced in equity in favor of the party who had broken his part of the promise, or had brought about the changed situation.   Such a party comes into this court in no proper light to plead an equitable estoppel.

I do not agree with my brothers, either, that the directors of the corporation had no power to change this rule after this breach of the donation by congress.   They passed the rule originally in conformity with the condition annexed to that act.   When that act was violated by congress by the diverting of a portion of the coins, the situation was changed.   The privilege of controlling the grounds recurred to it as if the act had never been passed, and it cannot be precluded from its right to reassume the privilege by a simple parliamentary rule or by-law.   To construe the law otherwise would be to sacrifice the substance of justice to the mere shadow of form.   I therefore disagree with my brothers in the conclusion which they have reached.